NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0225n.06

No. 13-3654

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LOCAL 1982, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| MIDWEST TERMINALS OF TOLEDO, INTERNATIONAL, INC., | ) ) ) | |
| Defendant-Appellee. | ) | |

**FILED**
*Mar 26, 2014*
DEBORAH S. HUNT, Clerk

Before: MERRITT, BOGGS, and STRANCH, Circuit Judges.

BOGGS, Circuit Judge. Midwest Terminals contends that "[t]his case is really quite simple." Appellee Br. 27. The danger with telling a federal court that a case is "really quite simple" is that sometimes the case may turn out to be simple in favor of your opponent. *Cf. Bennett v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 584, 584–85 (6th Cir. 2013) (explaining why not to call an opponent's argument "ridiculous"). In this case, Local 1982, a labor union, filed a grievance against Midwest Terminals, a business employing the union's members, under the grievance procedures of the parties' Master Agreement. Midwest Terminals felt that the particular grievance could only properly be addressed under the grievance procedures of the parties' Local Agreement, and so it did not participate in the Master Agreement grievance process. Local 1982 obtained an award in its favor from a grievance committee which it now seeks to enforce in federal court. The district court, interpreting ambiguous language in the Master

1

Agreement, determined that the Local Agreement procedures apply and vacated the award. Because the parties' collective-bargaining agreement is ambiguous about which grievance procedures apply, we defer to the grievance committee, reverse the district court, and direct the district court to enter an order enforcing the award.

I

A

Midwest Terminals of Toledo International, Inc. ("Midwest") operates the port at the mouth of the Maumee River at the west end of Lake Erie. It provides access to the Great Lakes and the St. Lawrence Seaway. Midwest engages in the stevedoring—the loading and unloading—of waterfront cargo. Midwest is a member of the Great Lakes Stevedore Employers ("GLSE"), a multiemployer bargaining group.

The International Longshoremen's Association ("ILA") is the largest labor union of maritime workers in North America. Local 1982 ("Union") is an affiliate local union based in Toledo, Ohio. It is also affiliated with the Great Lakes District Council ("GLDC"), a subordinate body of the ILA that has jurisdiction over employers and local unions in the Great Lakes region. The Union is the collective bargaining representative for Midwest's stevedores.

The Union and Midwest were parties to a collective-bargaining agreement ("CBA") consisting, in part, of a Master Agreement, effective from January 1, 2011, through December 31, 2012. The Master Agreement was formed between the GLSE and the GLDC, and both the Union and Midwest were signatories to it. The parties' CBA also consisted of a Local Agreement, effective from January 1, 2006, through December 31, 2010.

Both the Master and Local Agreements contain elaborate grievance-procedure provisions that Midwest and the Union must invoke to resolve disputes between them. The Master

2

Agreement provides that grievances "relating to the meaning and interpretation or application" of the Master Agreement are to be handled through that agreement's grievance and arbitration procedures. It also provides that grievances "relating to the meaning and interpretation or application" of the Local Agreement must be resolved only through the Local Agreement's grievance and arbitration procedures.

Specifically, section 25 of the Master Agreement states:

**Grievance and Arbitration Procedures**

**25. A**     Should any difference or dispute arise relating to the meaning and interpretation or application of any of the provisions of this Master Agreement (hereinafter referred to as "grievance") between the Employers party to this Agreement and an employee or group of employees of the GLDC-ACD/ILA, or one of the employees' Local Unions affiliated with the GLDC-ACD/ILA, such grievance will be handled and adjusted as hereinafter provided.

    1.   A difference or dispute relating to the meaning and interpretation or application of the provisions of a Local Agreement entered into with a Local Union affiliated with GLDC-ACD/ILA (including matters which, under this Master Agreement, are to be established or dealt with in Local Agreements) shall not be deemed to be a "grievance" hereunder and shall not be subject to the settlement and arbitration procedures provided under this section 21 [sic], but shall be resolved under the grievance and arbitration procedures provided for under such Local Agreement.

B

Around December 1, 2011, the Union submitted a draft grievance to Midwest concerning Midwest's failure to contribute to a required employer pension and welfare plan. In particular, the Union maintained that Midwest did not establish a plan and, thus, did not pay its required contributions to it. The dispute remained unresolved, and the Union filed an official grievance against Midwest on December 9, 2011. The Union's grievance was for: "Violation of Master Agreement Section 5.5A Welfare Contribution for Each Hr of Wages Paid Behalf of Each Actively Employed Person . . . ." The Union's grievance claimed that Midwest violated the

3

following CBA provisions: "Master Agreement & Local 1982 Agreement section 18[,] paragraph 18.1." As a remedy, it sought that Midwest: "Establish Health Welfare & pension Fund including a payment plan on the unfunded liability and the plan to be made whole."

The parties' CBA addresses pension and welfare plans. Section 5 of the Master Agreement provides in part:

**Contributions to Pension and Welfare Plans**

**5. A.** The minimum contribution to affiliated local union and employer ERISA approved benefit, pension and welfare plans for each hour of wages paid on behalf of each actively employed person, for the below listed years, for all ports except Toledo Grain, Duluth/Superior, and Milwaukee Grain, will be a total increase of $.**75** and shall be allocated according to the table listed below

1/1/2011 – 12/31/2011   an increase of   $.35 @ hour for a total of $14.35 @ hour
1/1/2012 – 12/31/2012   an increase of   $.40 @ hour for a total of $14.75 @ hour

The above listed minimum contributions are to be allocated as per affiliated local contractual agreements and affiliated local trust fund agreements.

Section 18 of the Local Agreement also addresses pension and welfare plans. It states in part:

18. PENSION AND HEALTH WELFARE FUND

18.1 Contributions. The Company shall accrue an obligation to the MWTTI-ILA Health Welfare & Pension Fund ("Fund") for each hour of work paid to members of the collective bargaining unit by the Company, whether paid at straight-time, overtime, penalty or premium rates and including standby time, guaranteed time and other nonproductive time actually paid ("contribution"). The contribution rate shall be determined be the Great Lakes District of the ILA and Employers Group. . . . The Fund is intended to constitute an unfunded obligation of the Company, but the Company shall maintain records of contributions, costs of benefits provided, and the current accrued balance.

. . .

Disputes. Disputes concerning the Fund shall be submitted as a grievance at Step Three of the Grievance Procedure within eighteen (18) months after the event giving rise to the grievance.

On December 12, 2011, Midwest responded to the Union with what it called a "STEP TWO response." Midwest maintained that the Union's grievance was procedurally invalid because it did not comply with the disputes clause in section 18.1 of the Local Agreement. Midwest also maintained that the Union's grievance was time-barred because, to the extent the grievance rested on a conflict between the two agreements, the "event" giving rise to the conflict was the signing of the Local Agreement on June 20, 2006—and the Union's grievance was filed more than eighteen months after that date. Third, Midwest stated that the two agreements were not in conflict and that Midwest was in compliance with the CBA's pension and welfare plan requirements.

After receiving Midwest's response to its grievance, the Union escalated the grievance to step two under the Master Agreement's grievance procedures by referring the matter to a "Joint Grievance Committee" consisting of one representative each from the GLDC and the GLSE.

The GLSE's representative was Keith Flagg of Federal Marine Terminals, Inc. On December 19, 2011, prior to the Joint Grievance Committee's meeting, Flagg e-mailed Midwest's senior management to notify Midwest that the Union's grievance was now at step two. Flagg expressed uncertainty about whether he was the proper GLSE representative: "[The Joint Grievance Committee] consists of myself (as employer rep) and Ray Sierra (as GLDC rep). Or at least it did during the last contract." Flagg stated that the Union's grievance concerned "a conflict between the GLDC [Master Agreement] language and your Toledo Local Language regarding ERISA H&W Trust funds." Flagg also was skeptical that the "very complicated" issue could be resolved by the grievance committee, and he predicted that the issue would likely be resolved in arbitration or court.

5

On January 4, 2012, Midwest wrote to the Union and provided a copy of section 25.A(1) of the Master Agreement, the provision stating that disputes "relating to the meaning and interpretation or application" of the Local Agreement must be resolved under that agreement's grievance procedures. Midwest indicated that it was awaiting the Union's response to its "Step Two response" of December 12. During this time, it appears that Midwest interpreted the Union's act of submitting the December 9 grievance as triggering step two of the Local Agreement's grievance procedures. Under that procedure, the Union submits a written grievance to Midwest, and Midwest must provide a written response.

On February 14, 2012, Flagg again e-mailed senior management at Midwest to report on a recent conversation he had had with Union representatives. Flagg wrote that he had asked the Union officials about its position regarding Midwest's claim that the Union was not properly following the Local Agreement's grievance procedures. Flagg explained that the Union's response was that "there is no local grievance" and that "there is only a grievance based on the GLDC Master Agreement." Flagg requested that Midwest management speak with the Joint Grievance Committee to provide its position. Flagg warned Midwest of the consequences of refusing to participate:

> If you choose not to enter into the process at all, my fear is that they will move forward and head to arbitration as called for in the Master Agreement grievance procedures. Arbitration is like flipping a coin and can go either way. If the union gets a favourable ruling[,] then they will probably use that in a lawsuit against you down the road.

On February 27, 2012, Raymond Sierra, the Joint Grievance Committee's GLDC representative, wrote to the president of Midwest to notify him that the committee set a hearing date for March 16, 2012, at 10:00 a.m., at the Toledo Park Inn.

6

Midwest did not respond to Sierra's letter, but on March 2, 2012, it wrote to the Union again requesting that the Union respond to its "Step Two response" of December 12. The Union did not submit a reply to what Midwest believed was its "Step Two response."

C

On March 16, 2012, the Joint Grievance Committee—the dispute-resolution body sanctioned by step two of the *Master Agreement*—held a hearing on the Union's grievance. Midwest did not appear. The committee asked the Union if it wished to proceed, and it did so. At the hearing, the Union argued that Midwest failed to establish a fund as required by the Master Agreement and that Midwest, instead, maintained its pension and welfare contributions in its general treasury.

Following the hearing, on March 28, 2012, Flagg—the GLSE management representative on the committee—wrote to the president of Midwest advising him that the committee held the hearing despite Midwest's failure to appear. Flagg requested that Midwest send the Joint Grievance Committee whatever pertinent information that Midwest wished to submit relating to the Union's grievance and to Midwest's compliance with the Master Agreement. The committee, Flagg wrote, wished "to fully understand the basis for the grievance and to make an informed ruling in the matter." Flagg indicated that the committee must receive Midwest's information prior to April 9, 2012, but that the committee could extend that deadline upon request. Flagg emphasized the importance of hearing from Midwest: "We feel strongly that all parties be afforded every opportunity [to] provide input in a grievance matter and that we obtain as much information as possible before making any kind of ruling on a grievance." Midwest never submitted any information to the committee.

7

On April 16, 2012, the Joint Grievance Committee issued its ruling against Midwest. The committee felt that Midwest "had ample time to establish trust fund plans that meet minimum ERISA standards" and that satisfy the requirements of section 5.A of the Master Agreement. It ruled "that a procedure be moved forward to correct [Midwest's] apparent violation of 5.A of the GLSE/GLDC Master Agreement."

On April 24, 2012, the Union wrote to Midwest enclosing a copy of the Joint Grievance Committee's award. The Union indicated that the Master Agreement permitted Midwest to appeal the committee's award within ten days from the date of issuance—until April 26, 2012. The Union informed Midwest that if it did not appeal within that time, the Union would assume that Midwest intended not to comply with the award. The Union further informed Midwest that, in that case, it would seek judicial enforcement of the award. Midwest maintains that it did not receive a copy of the Joint Grievance Committee's ruling against it until receiving the Union's April 24 letter.

On April 30, 2012, Midwest wrote to the Union to defend its actions. It stated that its December 12, 2011, and January 4, 2012, letters constituted its response to the Union's grievance. It stated that the Union's grievance "was filed . . . using a local grievance form and the local grievance procedure." It also stated that the Union's grievance "is currently being processed via the local grievance procedure and is in arbitration." Midwest further stated that any action that the Union "pursued outside the local CBA grievance procedure is an unnecessary duplication of effort." Midwest's did not mention the Joint Grievance Committee or the committee's ruling against it.

On May 15, 2012, Sierra—in his capacity as the GLDC representative on the Joint Grievance Committee—wrote to Midwest to inform it that the committee's April 16, 2012, ruling

8

was now "final and binding" in light of Midwest's failure to appeal. Sierra enclosed another copy of the April 16 ruling and another copy of the Union's April 24 letter regarding the ruling. Sierra indicated that the Joint Grievance Committee was in receipt of Midwest's April 30 letter in which Midwest "erroneously assert[ed] that this Master Agreement grievance is to be processed under the local contract grievance procedure." Sierra informed Midwest that it was incorrect and that "the Master Agreement, at Section 25.B., provides the exclusive grievance remedy to be followed regarding violations of the Master Agreement." Sierra indicated that Flagg—the GLSE management representative on the Joint Grievance Committee—had consented and approved of the letter. Midwest did not respond to the committee.

Instead, on May 23, 2012, Midwest sent the Union a strongly worded letter contesting the legitimacy of the Joint Grievance Committee's award and of its composition. It stated: "We have repeatedly made it clear to you that we do not recognize the union's unilateral efforts at the Master Agreement level and have not participated in this process." Midwest indicated that it viewed the Union's reliance on the Master Agreement's grievance procedures as an attack on its interests: "[W]e perceive the unnecessary continued duplication of efforts at the Master Agreement level to be a thinly veiled effort to undermine MWTTI's business interests." It also stated: "Your repeated use of the Master Agreement jurisdiction clause to mask union featherbedding and your numerous jurisdiction grievances dealing with cargo storage (a management right) are ALL designed to punish MWTTI for refusing to turn away business." Midwest accused the Union of engaging in "ongoing tortuous [sic] interference in MWTTI's business affairs."[1]

---

[1] Midwest may have meant "tortious" interference, although the complicated facts of this case are, indeed, tortuous as well.

9

In this letter, Midwest also suggested for the first time that Flagg, the GLSE representative on the Joint Grievance Committee, was improperly biased. It stated: "Federal Marine Terminals vice president Keith Flagg has made it very clear to MWTTI, in writing, that his primary focus in serving on a Master Agreement grievance committee is to protect FMT interests."[2] It also stated: "Any unfavorable ruling for MWTTI clearly benefits the business interests of FMT, a MWTTI business competitor." It further stated: "[T]he votes against MWTTI at the Master Agreement level were cast by a Management official and a Union officer employed at docks operated by FMT and that only FMT-related individuals were included in this decision."

D

The following week, on June 1, 2012, the Union filed suit in federal district court to enforce the grievance committee's award. Midwest counterclaimed, seeking an order vacating the award. Midwest subsequently filed a motion to vacate the award, and the Union filed a cross motion to confirm the award.

The district court, applying "one of the narrowest standards of judicial review in all of American jurisprudence," granted Midwest's motion to vacate the award. *Local 1982, Int'l Longshoremen's Ass'n v. Midwest Terminals of Toledo, Int'l, Inc.*, No. 3:12-cv-01384, 2013 WL 1855994, at *2, *6 (N.D. Ohio May 1, 2013). The district court determined that the Union's grievance "involves contractual provisions violated under both the Master CBA and the Local CBA." *Id.* at *4. The court interpreted the Master Agreement and held that that agreement

---

[2] Midwest appears to allude to Flagg's February 14, 2012, e-mail in which he said: "[Union officials] are going to keep pestering me with this until I have something to tell them. I'd resign from this committee as I don't want involvement in these matters but, then I wouldn't be in a position to protect FMT when they file ridiculous grievances against us like they always do in [Burns Harbor.]" We believe that Midwest mischaracterizes Flagg's e-mail. From context, it is evident that Flagg refers to protecting FMT interests from the unions—not from industry competitors like Midwest.

expressly excluded this grievance from the Master Agreement grievance procedures. *Id.* at *5. Recognizing that the presumption in favor of arbitration applies with particular force in labor disputes between an employer and a union, we reverse.

II

We review de novo a district court's conclusion about the arbitrability of a dispute. *Simon v. Pfizer, Inc.* 398 F.3d 765, 772 (6th Cir. 2005).

III

The parties dispute whether the Union's grievance is subject to the Master Agreement's or the Local Agreement's grievance and arbitration procedures. They do agree that section 25 of the Master Agreement controls. Under that provision, a grievance "relating to the meaning and interpretation or application" of the Master Agreement falls within the Master grievance procedures, and a grievance "relating to the meaning and interpretation or application" of a local agreement falls within the Local procedures. The Union's grievance relates to both agreements. The grievance claims a "violation of Master Agreement Section 5.5A" and of "Local 1982 Agreement section 18[,] paragraph 18.1." Section 25 does not specify which procedures apply when a grievance relates to both agreements. That is, the Master Agreement is ambiguous on this point.

The district court resolved this ambiguity by interpreting the Master Agreement language. It recognized that the grievance references both the Master and Local Agreements. *See Local 1982*, 2013 WL 1855994, at *5. Consequently, the district court reasoned, the Union's grievance was not subject to the Master procedures because of the "express provision excluding" the grievance. *See id.* The district court did not explain why the provision excluding Local disputes from the Master provisions overrode the provision subjecting Master disputes to the Master

11

provisions. The district court's theory, perhaps, was that the more specific provision trumped the more general provision. But the provision subjecting Master disputes to the Master procedures is just as specific as the provision excluding Local disputes from the Master procedures. The Master Agreement is unquestionably ambiguous on which grievance procedures apply to a dispute that relates to both the Master and Local Agreements.

The district court overstepped its role in resolving that ambiguity itself. As explained below, the threshold questions about how to interpret this ambiguity and how to proceed in the face of it were for the arbitrator to decide.[3]

A

Midwest responded to the Union's lawsuit seeking enforcement of the grievance award by asking the district court to vacate the award. Judicial review of an arbitration award is "one of the narrowest standards of judicial relief in all of American jurisprudence." *Lattimer-Stevens Co. v. United Steelworkers of Am.*, 913 F.2d 1166, 1169 (6th Cir. 1990). The district court stated that it recognized this principle, *see Local 1982*, 2013 WL 1855994, at *2, as does Midwest, *see* Appellee Br. 20.

The Supreme Court recognizes it, too. In *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504 (2001) (per curiam), the Court summarily reversed a circuit court's decision and explained that judicial review of arbitration decisions is "very limited." *Id.* at 509. The Court asked whether the arbitrator was "even arguably construing or applying the contract and acting within the scope of his authority." *Id.* The Court explained that even a court's firm

---

[3] For convenience, we use "arbitrator" as shorthand for the various entities involved in the Master Agreement's grievance and arbitration procedures. Formal arbitration, however, only occurs when the parties have exhausted the other procedures in steps one to three.

12

conviction that the arbitrator "committed serious error does not suffice to overturn his decision." *Id.* "[O]nly when the arbitrator strays from interpretation and application of the agreement," the Court explained, does it enter the forbidden world of "effectively dispens[ing] his own brand of industrial justice," making the arbitrator's decision "unenforceable." *Id.* (internal quotation and alteration marks omitted). "When an arbitrator resolves disputes regarding the application of a contract," errors that are "improvident, even silly" do "not provide a basis for a reviewing court to refuse to enforce the award." *Id.* As in *Garvey*, "the [lower court] here recited these principles, but its application of them is nothing short of baffling." *Id.* at 510.

> This circuit, sitting en banc, has addressed when a court may set aside an arbitration award:
>
> Did the arbitrator act 'outside his authority' by resolving a dispute not committed to arbitration? Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? And in resolving any legal or factual disputes in the case, was the arbitrator 'arguably construing or applying the contract'? So long as the arbitrator does not offend any of these requirements, the request for judicial intervention should be resisted even though the arbitrator made 'serious,' 'improvident' or 'silly' errors in resolving the merits of the dispute.

*Michigan Family Res., Inc. v. Serv. Emps. Int'l Union Local 517M*, 475 F.3d 746, 753 (6th Cir. 2007) (en banc). We recognized that federal courts even "must tolerate 'serious' arbitral errors." *Id.* at 753. We determined that judicial review of an arbitration award is reserved for the "rare case" when "an arbitration decision [is] so ignorant of the contract's plain language [so] as to make implausible any contention that the arbitrator was construing the contract." *Id.* (internal citations, quotation marks, and alteration marks omitted). Only in a rare case would "an interpretation of a contract . . . be so untethered to the terms of the agreement that it would cast doubt on whether the arbitrator was engaged in interpretation." *Id.* (internal citations and quotation marks omitted).

Here, Midwest's contention is that the grievance committee acted outside its authority by resolving a dispute not committed to arbitration. The district court relies on our statement that

13

"[w]hether [a party] is bound to arbitrate [a] grievance involves a question of contract interpretation . . . that is properly decided by the courts." *S. Cent. Power Co. v. Int'l Bhd. of Elec. Workers*, 186 F.3d 733, 738 (6th Cir. 1999). That is true, as "arbitration is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks omitted). "The first task of a court asked to [resolve arbitrability] of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). But, as the district court recognized, there is no dispute that the parties are bound to arbitrate the grievance. *See Local 1982*, 2013 WL 1855994, at *3. The question is only which procedure applies. Answering that question requires resolving contractual ambiguity, and the underlying "question of contract interpretation [is] for the arbitrator." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567 (1960).

The heart of the district court's argument is that the provision subjecting local grievances to local procedures constitutes express exclusionary language. *See Local 1982*, 2013 WL 1855994, at *4. Regardless of the validity of that argument, it fails to address the express provision allocating Master grievances to Master procedures. The Sixth Circuit cases cited by the district court are not on point, as they involved CBA clauses that excluded certain categories of grievances from arbitration without any arguable ambiguity. *See Teamsters Local Union No. 783 v. Anheuser-Busch, Inc.*, 626 F.3d 256, 260–64 (6th Cir. 2010) (CBA expressly excluded from arbitration disputes over determination of rights under pension plan); *Int'l Ass'n of Machinists v. AK Steel Corp.*, 615 F.3d 706, 711–13 (6th Cir. 2010) (parties agreed to arbitrate only certain enumerated issues). The CBA in this case is silent—or, alternatively, internally in tension—about how to proceed with a grievance that relates to both the Master and Local Agreements.

14

B

Even if the district court were the proper authority to resolve the ambiguity in the Master Agreement language, its conclusion is difficult to support against the backdrop of a federal policy supporting a presumption of arbitrability in the labor-law context. The presumption in favor of arbitration applies with particular force in labor disputes between an employer and a union. The text of the Labor Management Relations Act provides that "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. § 173(d).

Congressional policy favors the "private settlement of disputes" under collective-bargaining agreements. *Int'l Union, UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 702 (1966). This policy "in favor of settlement of disputes by the parties through the machinery of arbitration" is long-recognized. *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). "[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT &T Techs.*, 475 U.S. at 650. Furthermore, any "[d]oubts should be resolved in favor of coverage." *Id.* Here, there is no *positive assurance* that the Master Agreement does not cover the dispute. Were the district court the appropriate authority to resolve the Master Agreement's ambiguity, the presumption in favor of arbitration would seem to militate *in favor of* coverage.

The presumption in favor of contractually agreed-upon alternative dispute resolution extends to a range of questions that may arise about a contract. Even "attacks on the validity of

15

the contract" must "be resolved by the arbitrator in the first instance."[4] *Nitro-Lift Techs., L.L.C. v. Howard*, 133 S. Ct. 500, 503 (2012); *see United Steelworkers of Am. v. Saint Gobain Ceramics & Plastics, Inc.*, 505 F.3d 417, 420 (6th Cir. 2007) (en banc) ("If doubt exists over whether a dispute [concerning procedural requirements for arbitrating a case] falls on one side or the other of this line, the presumption in favor of arbitrability makes the question one for the arbitrator.").

The mere presence of an arbitration clause in a contract does not remove all questions about the contract from the judicial ken. Questions about "contract formation"—whether the parties ever agreed to the contract in the first place—are "generally for courts to decide." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2856–57 (2010). The Court has been clear that "[t]o satisfy itself that [an] agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have a court enforce." *Id.* at 2856. In this case, however, the parties contest neither the proper formation and validity of the CBA, nor whether Midwest is bound by the Master Agreement.

C

Nothing in the record, other than Midwest's own statements and own intransigence, supports its claim that the Union's grievance was one purely under the Local Agreement. Although we do not determine in the first instance whether the Union's grievance was one under the Master or Local Agreements, we observe that it appears, on its face, to be a hybrid. The grievance alleges a "Violation of Master Agreement Section 5.5A" and also of "Local 1982 Agreement section 18[,] paragraph 18.1." On December 19, 2011, Flagg formally notified

---

[4] The Supreme Court generally uses "validity" as a term of art to refer only to questions of the applicability of contractual defenses. *See, e.g.*, *Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2778 n.2 (2010) (explaining that "[t]he issue of the agreement's 'validity' is different from the issue whether any agreement between the parties 'was ever concluded.'").

Midwest that the Union had filed a grievance against it under the Master Agreement. Midwest chose to ignore this communication and to presume, in its communication with the Union, that the Local Agreement procedures were underway.

Midwest offered the Union differing reasons about why the grievance fell under the Local Agreement. On April 20, 2012—after the committee held its hearing—Midwest claimed that the grievance fell under the Local Agreement because it was submitted "using a local grievance form." The Union's grievance form is titled: "GRIEVANCE FORM: ILA Local 1982." Nothing about it suggests it is a "local grievance form." On May 23, 2012, again after the grievance-resolution process had concluded, Midwest claimed that it construed the grievance as a Local one because of the past practices of the parties. On appeal, as well, Midwest argues that "[t]he Union's past practice establishes that violations of the Master Agreement that even minimally impact the Local Agreement – even when the grievance itself does not cite violations of the Local Agreement – are processed and determined pursuant to the grievance procedure under the Local Agreement." Appellee Br. 8 n.2. But whether the Union had ever invoked the Master Agreement's grievance procedures before has no plausible bearing on the effectiveness of that section of the CBA. We do not believe that the use-it-or-lose-it rule applies to validly formed contractual provisions. To the extent that Midwest wishes to argue that the past practices of the parties implicitly altered the terms of the CBA, it could have made that argument to the grievance committee. There is no evidence that Midwest presented any of these arguments to the committee.

Midwest also challenged the neutrality of the grievance committee—again for the first time in its May 24, 2012, letter—on the ground that Flagg was biased against it. Midwest stated: "Federal Marine Terminals vice president Keith Flagg has made it very clear to MWTTI, in writing, that his primary focus in serving on a Master Agreement grievance committee is to protect

17

FMI interests." Midwest offers no factual support for that statement. To the extent Flagg's emails evince any bias, it is bias against labor unions. In the May 24 letter, Midwest also complained that "only FMT-related individuals were included in this decision." But Flagg repeatedly pleaded with Midwest to include itself in the grievance process. On March 28, 2012—even after Midwest failed to appear for the committee hearing—Flagg solicited Midwest's perspective, as the committee "fe[lt] strongly that all parties be afforded every opportunity [to] provide input." Midwest did not respond.[5]

IV

The presumption in favor of arbitration is particularly strong in the labor-law context. *See, e.g.*, *Michigan Family Res., Inc.*, 475 F.3d 746 ("[F]ederal courts' review of labor-arbitration decisions is not just limited; it is very limited." (internal quotation marks and citations omitted)); *see also PureWorks, Inc. v. Unique Software Solutions, Inc.*, No. 13-5115, 2014 WL 211831, at *5 (6th Cir. Jan. 21, 2014) (Stranch, J., concurring) ("There has been a decided move to mandate the use of arbitration for resolution of business against business disputes. Statutes and now caselaw frequently enforce that intention."). That move is especially evident with labor disputes. This case, for instance, is not a difficult one in light of some of our recent decisions. A dose of pragmatism may serve parties more than a team of lawyers in deciding how to proceed in the face of broad arbitration clauses.

In this case, Midwest did not formally contest the Joint Grievance Committee's authority. It simply chose not to participate. As the Ninth Circuit said: "A party may not sit idle through an

---

[5] Midwest also challenged the Joint Grievance Committee's authority on the ground that, bias aside, it simply did not consent to Flagg as the GLSE representative. On this point, we agree with the district court: "Midwest does not provide any guidance or authority which governs this selection process to support its assertion nor does the arbitration provision address a selection process." *See Local 1982*, 2013 WL 1855994, at *5.

18

arbitration procedure and then collaterally attack that procedure on grounds not raised before the arbitrators when the result turns out to be to adverse." *Marino v. Writers Guild of Am., East, Inc.*, 992 F.2d 1480, 1484 (9th Cir. 1993). Keith Flagg, the GLSE management representative on the Joint Grievance Committee, pleaded with Midwest to participate in the process and warned Midwest of the consequences of failing to do so. On February 14, 2012, he e-mailed Midwest: "If you choose not to enter into the process at all, my fear is that [the Union] will move forward and heard to arbitration as called for in the Master Agreement grievance procedures. . . . If the union gets a favourable ruling[,] then they will probably use that in a lawsuit against you down the road." For the reasons above, we REVERSE and REMAND the case and direct the district court to enter an order enforcing the arbitration award.